UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                        :
UNITED STATES OF AMERICA                :
                                        :          Criminal No. 03-836 (JAP)
                                        :
              v.                        :
                                        :
                                        :          **OPINION**
WILLIAM BASKERVILLE                     :
                                        :
_____:

## I.      Introduction

In November 2003, William Baskerville was arrested for distributing crack cocaine to an

individual who was cooperating with federal law enforcement agents.  In March 2004, while

Baskerville was in jail awaiting trial, the principal cooperating witness against him, Kemo

DeShawn McCray, was shot and murdered while walking down the street in Newark.  In

connection with McCray's death, Baskerville was charged with conspiring with his then lawyer,

Paul Bergrin, and others to kill McCray in retaliation for cooperating against Baskerville and to

prevent McCray from testifying.  After nearly six weeks of jury selection and a trial that lasted

over a month, on May 1, 2007, a jury convicted William Baskerville of two capital offenses –

conspiracy to murder a witness in violation of 18 U.S.C. § 1512(k) and conspiracy to retaliate

against an informant in violation of 18 U.S.C. § 1513(c) – as well as of several counts related to

drug trafficking.  The jury was unable to reach a unanimous verdict on whether the death penalty

should be imposed for the capital offenses, therefore Baskerville was sentenced to life in prison

without the possibility of release on all counts.  Baskerville has appealed his conviction to the Court of Appeals for the Third Circuit.

On appeal, Baskerville has argued, among other things, that the Court erred in denying Baskerville's *Batson*[1] challenge to the prosecution's use of its peremptory strikes to remove certain black prospective jurors from the panel.  While preparing for oral argument on the appeal, counsel for the Government discovered that the trial prosecutor's jury selection notes contained information relevant to the *Batson* claim, and the Government moved before the Court of Appeals to remand the matter to this Court for further proceedings.  According to the Government's motion to remand, the notes "contain material that Appellant Baskerville potentially could use to bolster his [*Batson*] claim … [and] also contain material that is inconsistent with any such challenge."  Motion to Remand at 1, No. 07-2927 (3d Cir.).  These notes, however, were not part of the appellate record.  The Government, therefore, requested a remand to allow this Court the opportunity to conduct a new *Batson* hearing and consider the new information with respect to its *Batson* ruling.  *Id.*  The Third Circuit, "declin[ing] to entertain new issues, or engage in proceedings, based on anything other than what is contained in the District Court record," remanded the matter and stated that while they "respect the government's desire to augment that record, … by remanding we are not deciding the extent, if any, to which the District Court should hold further proceedings or change its rulings based on any such further proceedings."  Order at Docket Entry #266.

Shortly after the matter was remanded, Baskerville filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.  In his motion, he alleges that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose evidence in its possession

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

allegedly showing that Paul Bergrin, Baskerville's former attorney, also conspired to murder witnesses in cases unrelated Baskerville's case.

**II.     *Batson* Remand**

A.  Background

     The jury selection process in this case was extensive and proceeded in several stages over a two-month period.  The initial stage involved counsel and the Court preparing a comprehensive 42-page juror questionnaire that included, among other things, a number of questions devoted to the death penalty.  Thereafter, on February 13, 15, and 16, 2007, several hundred prospective jurors were summoned to complete the questionnaire.  On these dates, several individuals were excused due to hardship, after which approximately 224 prospective jurors remained.  Their completed questionnaires were reviewed by counsel over the next 10 days.  Beginning February 26 and continuing several days each week until March 21, 2007, the Court and counsel questioned the venirepersons, and many were struck for cause or excused.

     On March 21, 2007, the remaining approximately 80 venirepersons were randomly reshuffled and assigned new juror numbers.  Of these approximately 80 potential jurors, six were African American.  Taking into account the number of peremptory strikes allotted to each side, the jury was to be selected from the first 52 (by newly assigned number) of these venirepersons.  Of these 52 potential jurors, five were African American.

     On March 29, 2007, the parties exercised their peremptory challenges.  In total, the Government used 22 such challenges and Baskerville used 21.[2]  In exercising their challenges, the Government struck four of the black potential jurors (juror numbers 35/31, 56/108, 47/72 and

---

[2] These totals include alternates.

33/36[3]).  After the first three black potential jurors had been struck, the defense raised a *Batson*

challenge.  Tr. 3204:8-11.  In response, the Government argued that the defense did not make the

required initial showing under *Batson*, and it further argued that it exercised its challenges

against these prospective jurors for race-neutral reasons:

> MR. FRAZER:  Number 31 clearly said she leans toward life
> imprisonment.  That was the question the defense put, how do you lean one way
> or the other, even though you say you can be fair.  She leans toward life
> imprisonment.  We thought that she should have been challenged anyway.
>
> She also said – first of all, her child's father is in jail, so that's another
> reason that she may not be appropriate, she may harbor feelings about the
> criminal justice system.  For those reasons, Judge, -- and she said it would be
> really hard to impose the death penalty.  For those reasons, we challenged juror
> number 31.
>
>            * * *
>
> MR. FRAZER:  108, wrote on her questionnaire, "thou shall not kill" is
> her religion and she agreed it.  She "hates the idea of the death penalty."  This is a
> quote.  That's what she said both on the questionnaire and when I questioned her,
> she said that was the correct words.
>
> Her husband's brothers are both in jail for drug-related offenses and has
> been in jail off and on at various times for five years, one of them and one
> recently went in for a drug offense.
>
> She said as to that one, he was at the wrong place at the wrong time, so
> obviously that's questionable about whether she can – what her attitudes toward
> law enforcement might be.  Those are the reasons for juror number 108, which I
> think are fairly obvious.
>
> Finally, 72, …
>
>            * * *
>
> … she was the Jamaican woman who was just all over the place and she
> had concerns over the death penalty that it may not – what happens if it is not the
> right person?  She was easily confused, she went back and forth on numerous
> questions.

---

[3] Voir dire in this case was conducted so as not to reveal the name, address or place of employment of any member of the venire, and the jury ultimately selected was anonymous.  Therefore, the Court shall here refer to the venirepersons by both their initial and subsequently assigned juror number in the following fashion:  [new juror number] / [old juror number].

Other than that, I'd have to pull my questionnaire, but I believe she also had a family member, husband's cousin in jail, but I would have to actually get the questionnaire, Judge.  I have numerous notations that her questions on the questionnaire were, to say the least, questionable.  I have seven of them listed.  I'm just going to pull that for a moment.

First, on the questionnaire, she failed to fill out her county and town of residence.  She did not fill out the portions of the questionnaire which made it – it was unusual actually in relation to the rest of the pool.  She, for instance, did not fill out her education in the questionnaire.  She did not fill out anybody that influenced her in her life and again, based upon – I remember her clearly, Judge.  Her answers were equally kind of back and forth throughout the entire process.

She also didn't fill out question 67, 68 regarding the defendant testifying and the presumption of innocence.

Overall, those were the reasons that the Government struck this juror.  She also put a question mark under her religion, what her religion or spiritual affiliation was and what the teachings were.

Tr. 3204:20 -  3207:7.

The defense offered no further evidence or argument in support of its *Batson* claim.  The Court found that the Government's challenges were exercised for race-neutral reasons and ruled against Defendant on his initial *Batson* challenge.  Notably, although counsel for the Government concluded his argument by stating that "as we're doing this, Mr. Minish and I have no idea the race of the jurors" and "[t]hat's not written down on anything that we do, for the record."  (Tr. 3207:11-13), the Court expressly stated that it did not rely upon such representations in reaching its decision.  Tr. 3207: 4-10 ("I make that finding without the representation by Mr. Frazer that they don't know the race of the jurors from the notes that they've kept … the Court's ruling on it doesn't require that representation because there has been a non-racial justification set forth for each of those challenges.").

The Government subsequently exercised a strike against a fourth black prospective juror, number 33/36, and the defense renewed its *Batson* challenge.  Again, the Government argued that it exercised its strike as to this juror for race-neutral reasons:

> Her sister is in jail for a federal drug distribution.  She first said it was state and then I questioned her because she mentioned the institution, which was a federal institution and so it was in New Jersey, I believe, although I could be wrong on that.
>
> Right away, Judge, immediately that gave us cause because it's possibly our office or at least a United States Attorney's Office that put her sister in jail for a drug offense, the same as what's on trial here.  It should be obvious, but I guess it's not.
>
> So, therefore, we immediately, when we heard that, thought she said she could be fair, that's why we have peremptory challenges.  We thought we would exercise one based upon that, which clearly could show a reason to harbor ill feelings toward both prosecutions and specifically federal prosecution and law enforcement in general.
>
> That was the main reason we struck her.

Tr. 3210:4-20.  Again, the defense offered no further evidence or argument in support of its *Batson* claim.  The Court again found that the defense had not demonstrated that the Government's exercise of its peremptory strikes was motivated by discriminatory intent and permitted the strikes.

A.  *Batson* Three-Part Inquiry

It is well-established that the Equal Protection Clause of the Fourteenth Amendment "prohibits a prosecutor from using a peremptory challenge to strike a prospective juror solely on account of race." *Coombs v. Diguglielmo*, 616 F.3d 255, 261 (3d Cir. 2010) (quoting *Holloway v. Horn*, 355 F.3d 707, 719) (citing *Batson*, 476 U.S. at 88, 106 S.Ct. 1712)).  As the Supreme Court in *Batson* stated, "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community.  Selection

procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson v. Kentucky*, 476 U.S. 79, 87 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

The Supreme Court has established a three-step inquiry to guide courts in their analysis of the constitutionality of challenged peremptory strikes.

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 552 U.S. 472, 476-77, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008) (citations and quotations omitted, alteration in the original). Such framework serves the public purposes of *Batson* while encouraging "prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process." *Johnson v. California*, 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) (quoting *Hernandez v. New York*, 500 U.S. 352, 358, 111 S.Ct. 1859, 114 L. Ed.2d 395 (1991)). This was the analysis followed by the Court in this case at the *Batson* hearing.[4]

B.  Proceedings on Remand

On this remand, the parties have asked the Court to reopen the *Batson* hearing and expand upon the ruling it made at trial -- in particular, step three of the *Batson* analysis. Although the basis for the remand centered on the recently-produced voir dire notes, the parties' here have raised certain arguments not necessarily based upon the notes that could have been raised at the time of the *Batson* hearing but were not. For example, Baskerville raises the argument, not made originally, that a comparative analysis of the black jurors struck by the

---

[4] The Court shall refer to that portion of the 2007 proceedings in which Baskerville's *Batson* challenge was raised and addressed as the "*Batson* hearing."

Government and the white jurors not struck allegedly shows that the Government's articulated reasons for the challenged strikes were pretextual.  In support of his assertion that the Court should now consider such arguments on remand, Baskerville argues that, despite the failure of the defense to argue pretext at all at the original *Batson* hearing, the Court had an obligation to *sua sponte* engage in a comprehensive analysis of the jury selection record -- and, in particular, conduct a comparative analysis of the black jurors struck by the government and the white jurors not struck -- in order to determine whether or not the justifications offered by the Government were pretexts.  Such an analysis would have included, among other things, a detailed review of numerous questionnaires completed by the prospective jurors, a review of the voir dire transcripts and, very likely, further examination of the prosecutors.  Baskerville argues that the Court failed to fulfill this purported obligation at trial, but has the opportunity on this remand "to resolve the Batson issue properly."  Def. Br. At 39.

As a threshold matter, the Court finds no authority that would have required it to engage in the type of independent review suggested by the defense.  Baskerville did not previously raise the issue of pretext and, significantly, he has pointed to nothing in the record -- such as, for example, facially implausible, vague or unreasonable explanations for the strikes -- that should have alerted the Court that, even absent any further argument from the defense, a more searching analysis of the prosecutor's justifications was warranted.  Rather, Baskerville's argument is, in essence, that once a defendant raises a *Batson* objection and the prosecution offers a race-neutral explanation for the strikes, without more, the burden shifts to the Court to scour the record for any evidence of pretext.  Several courts have rejected such an approach.  *U.S. v. Houston*, 456 F.3d 1328, 1338-39 (11th Cir. 2006) (rejecting the argument that the Supreme Court's decision in *Miller-El* placed "a duty on the trial court to conduct an independent inquiry into the relevant

facts and circumstances bearing on the credibility of the prosecution's stated reasons" and noting that "[r]equiring the court to develop the defendant's arguments through examination of the prosecutor would make the judge an advocate rather than a neutral arbiter."); *U.S. v. Barnette*, 2010 WL 2085312, *8 (W.D.N.C. 2010) (rejecting the argument that "a trial judge has an independent duty under *Miller-El* to conduct a thorough search of the record for evidence of pretext notwithstanding a defendant's failure to put forth evidence of purposeful discrimination at the *Batson* hearing."). *See also Johnson v. Gibson*, 169 F.3d 1239 (10th Cir. 1999) (declining to hold that "the *Batson* inquiry imposes an independent duty on the trial court to pore over the record and compare the characteristics of jurors, searching for evidence of pretext, absent any pretext argument or evidence presented by counsel" in light of the "Supreme Court's directive that 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'") (citing *Purkett v. Elem*, 514 U.S. at 768). *But see United States v. Torres-Ramos*, 536 F.3d 542, 560 (6th Cir. 2008) (district court has an "affirmative duty … to examine relevant evidence that is easily available", including juror questionnaires).

The Order from the Court of Appeals remanding this matter left to this Court's discretion what, if any, further proceedings to hold in light of the prosecutor's jury selection notes that have recently been produced. The Court has carefully considered the submissions of the parties and the oral argument presented. The Court's approach on this remand will be to review and clarify the basis for its original *Batson* ruling, and it will reopen the *Batson* issue only to the limited extent necessary to consider whether the newly-produced evidence bears on the original decision. Because the prosecutor's voir dire notes were not available to the defense at the time of the *Batson* hearing, the Court shall consider the parties arguments that relate to the notes.

However, the Court shall not reopen the *Batson* hearing in its entirety and shall not consider arguments that could have been raised originally but were not.

C.  Analysis

To fulfill the first step in the *Batson* inquiry, the objecting party must make a *prima facie* showing that their opponent's exercise of a peremptory challenge was based on an impermissible characteristic such as race.  When Baskerville raised his objections under *Batson*, as support he pointed to the fact that the Government had used its peremptory strikes to remove three, then four, of the five total African Americans in the pool.  Although the Government appeared to believe that Baskerville failed to meet the requirement of *Batson's* first step and make a *prima facie* showing that the challenged strikes were race-based, *see*, *e.g.*, Tr. 3204:12-13 ("I don't think they made out a pattern under *Batson*, which is the threshold."), the prosecution nonetheless offered explanations for the strikes.  Therefore, the issue of whether Baskerville had made the *prima facie* showing became moot, and the Court did not address it.  *United States v. Jones*, No. 09-2009, 2010 WL 4720885, *2 (3d Cir. 2010) ("The question of whether a *prima facie* case has been established 'becomes moot, and thus need not even be addressed, when the prosecutor provides explanations for the strikes.'") (quoting *Holloway v. Horn*, 355 F.3d 707, 723 (3d Cir. 2004)).

The second step of the analysis requires the prosecution to offer a race-neutral basis for the exercise of the challenged strike.  "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006) (quoting *Purkett v.*

*Elem*, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)).  A determination of the persuasiveness of the justifications offered is made at step three.

The Court found that the Government met its burden at step two because the reasons for the strike given by prosecutors were race-neutral.  As to Juror 35/31, a black female, the Government explained that it struck her because "she leans toward life imprisonment," "her child's father is in jail … [therefore] she may harbor feelings about the criminal justice system," and "she said it would be really hard to impose the death penalty."   Tr. 3205:20 to 3205:4.  The Government stated that it struck Juror 56/108, also a black female, because she wrote on her questionnaire that " 'thou shalt not kill' is her religion and she agreed [with] it" and that she "hates the idea of the death penalty."  Tr. 3205:15-17.  Also, her husband's brothers were both in jail for drug-related offenses and had been in and out of jail at various times, and, therefore, the Government thought that her attitude toward law enforcement might be "questionable."  Tr. 3205:20 to 3206:3.  According to the Government, Juror 47/72, a black female, was struck because "she was just all over the place," "had concerns over the death penalty" being applied against an innocent person, and was someone who was "easily confused" and "went back and forth on numerous questions."  Tr. 3206:6-10.  She also failed to fill out a number of questions on the questionnaire and answered questions about her religion with a question mark.  *See* Tr. 3206:18 to 3207:7.  Finally, as to Juror 33/36, the Government struck her because her sister was in jail on a federal drug conviction and prosecutors were concerned that she therefore had "a reason to harbor ill feelings toward both prosecutions and specifically federal prosecution and law enforcement in general."  Tr. 3210:4-20.

The defense offered no response to these reasons offered by the Government.  The Court, moving to step three of the *Batson* analysis, found that the Government's "exercise of the

11

challenges [was] based upon non-racial reasons" and allowed the strikes.  By way of this Opinion, the Court now makes explicit what was implicit in the Court's ruling at that time.  In overruling Baskerville's *Batson* objections, the Court found that the reasons offered by the Government for striking each of the black prospective jurors were credible and not pretexts for racial discrimination.  The proffered reasons were the actual reasons for the Government's exercise of each of the challenged strikes.   As was its burden, the defense simply did not show that the Government's exercise of any of the challenged strikes was racially-motivated.

These findings of the Court were based upon several factors.  At step three, "the critical question in determining whether a prisoner has proved purposeful discrimination … is the persuasiveness of the prosecutor's justification for his peremptory strike."  *Miller-El v. Cockrell*, 537 U.S. 322, 338-39, 123 S. Ct. 1029, 154 L.Ed.2d 931 (2003).  The Supreme Court has noted that generally "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible."  *Id.* at 339.  "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."  *Id.*  Here, the reasons proffered by the Government were credible -- they were reasonable, believable, probable and grounded in accepted trial strategy.  The Court also found counsel for the Government to be credible and found no evidence of purposeful discrimination in counsel's demeanor.  *See Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 1208 (2008) ("Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.") (internal quotations and citations omitted; alteration in original).

With respect to credibility, the Court finds it appropriate to address AUSA's Frazer's statement in which he told the Court in response to the *Batson* challenge that "as we're doing this, Mr. Minish and I have no idea the race of the jurors" and "[t]hat's not written down on anything that we do, for the record."  Tr. 3207:11-13.  In light of the newly-produced voir dire notes, the defense now argues that here the Government attempted to mislead the Court.  Baskerville alleges that AUSA Frazer's statement was "false" and "disingenuous," Def. Brf. at 1, 26, because the Government's jury selection notes show that the prosecutors did, in fact, have the race of prospective jurors written down.

Looking at the circumstances at the time the statement was made, the Court finds that AUSA Frazer's statement was not a deliberate attempt to mislead the Court.  This conclusion rests not only on the Court's own observations of Mr. Frazer's demeanor at the time, but also on the context in which the statement was made.  Indeed, at the time Mr. Frazer made that statement the Court and both of the parties were well aware that the prospective juror's race was, in fact, "written down" on at least some of the voir dire materials (*e.g.*, the questionnaires) and, therefore, AUSA Frazer's statement -- as reflected in a cold transcript -- was facially inaccurate and an apparent misstatement.  Yet at that time it was made there was no argument from the defense that AUSA Frazer was attempting to mislead the Court, nor did the Court construe his statement in such a way.

To the extent that counsel's statement appears to be inconsistent with his or AUSA Minish's notes, the Court finds that counsel simply misspoke, or, at worst, inarticulately stumbled in his attempt to convey his argument.  Given its context, the Court recognized at the time Mr. Frazer made the statement that there was a possibility that he may have misspoken; therefore, the Court expressly noted that it did not rely upon counsel's representation in ruling on

the *Batson* challenge.  *See* Tr. 3208: 4-10 ("I make that finding without the representation by Mr. Frazer that they don't know the race of the jurors from the notes they've kept …").  Nothing presented to the Court since that ruling in any way leads the Court to believe that any misstatement on the part of AUSA Frazer was deliberate.

At the *Batson* hearing, the Court found further support for its conclusion that the Government's stated reasons for exercising its strikes were credible and not pretexts for racial discrimination in the response -- or lack thereof -- of the defense.   Defense counsel's silence[5] after the Government explained its reasons for the challenged strikes supported inferences that defense counsel was unaware of anything in the record that contradicted the reasons given, had no basis to challenge the prosecutor's justifications, and even that the defense may have conceded the objections.  Indeed, Baskerville was represented by extremely capable counsel, experienced in death penalty cases, who certainly would have been well aware that Baskerville bore the burden to establish that the Government's strikes were racially motivated.  *See Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771 (1995) ("[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."); *Rice v. Collins*, 546 U.S. 333, 338, 126 S. Ct. 969 (2006) (same); *Johnson v. California*, 545 U.S. 162, 170-71, 125 S.Ct. 2410 (2005) ("*Batson* … explicitly stated that the defendant ultimately carries the burden of persuasion to prove the existence of purposeful discrimination.") (quotations omitted); *Bond v. Beard*, 539 F.3d 256, 264 (3d Cir. 2008) ("The burden at this step three is to show that it is more likely than not that the prosecutor struck at least one juror because of race.") (citing *Wilson v. Beard*, 426 F.3d 653, 670 (3d Cir. 2005).  If counsel had reason to believe the

---

[5] In its opening brief on this remand, the Government argued that Baskerville waived his pretext claims as a result of his failure to respond to the Government's explanations for its peremptory challenges.  The Government has since withdrawn that argument, citing the Supreme Court's recent invocation of Fed. R. Crim. P. 57(b) in *Black v. United States*, 130 S. Ct. 2963, 2970 (2010).

reasons offered by the Government were pretextual, surely the defense would have spoken up. Notably, Baskerville does not assert that he was in any way denied the opportunity to present further argument and evidence regarding pretext.

Lastly, the Court turns to the parties remaining arguments regarding the prosecutor's voir dire notes.  Baskerville argues that evidence of purposeful racial discrimination is found in the fact that these notes contained references to "constitutionally-protected characteristics, including race and gender," Def. Br. at 5, and that the prosecutors ranked and/or graded the desirability of the potential jurors "based upon characteristics and comments recorded in their notes, which included the jurors' race and gender," Def. Br. at 26.  Having reviewed the prosecutor's notes in their entirety, the Court finds in them no basis to disturb the Court's conclusion that there was no *Batson* violation here.

First, the Court finds nothing improper, as a general matter, about the fact that the prosecution's notes contained notations regarding race in this case.  The fact that the Government's lawyers made notations regarding identifying characteristics such as race is hardly surprising in a post-*Batson* matter and, particularly, in light of the large number of potential jurors in this case as well as the extended period of time it took to select a jury.  Indeed, both parties, not just the Government, believed race was relevant enough to the jury selection process to include it on the juror questionnaire.

Further, as the notes show and the Government has explained, the prosecution used a grading system for the final selection of jurors.  Prospective jurors were ultimately assigned "E" for excellent; "VG" for very good; "G" for good; and "S" for strike.  In exercising their strikes, the record shows that the Government first struck those prospective jurors with the lowest grades, then moved up to the higher graded prospective jurors.  Contrary to the assertion of the

defendant, there is no evidence race played any part in the determination of a potential juror's grade. Nor does the Court find that the grades assigned to the jurors were in some way a proxy for race. Indeed, black prospective jurors in the pool were given grades across the entire spectrum. Prior to the final reshuffling of the approximately 80 prospective jurors (and, thus, not knowing the order in which the jurors would end up), the Government graded each of the jurors. Of the six black prospective jurors (only five of which ended up in the pool of 52), three were graded "strike", one was graded "good", one was graded "very good" and one was graded "excellent."

The manner in which the strikes were exercised -- in particular, the fact that the prosecution consistently struck jurors within a given grade before striking jurors with a higher grade -- further supports the conclusion that race was not the basis for any of the Government's challenged strikes. Indeed, when exercising their strikes, the government first struck jurors that were graded "strike," then the jurors graded "good." Moving then to those rated "very good," for its final two strikes, the Court takes particular note of the fact that the Government struck two white prospective jurors (Jurors 14/331 and 45/120) while a black prospective juror (17/342) with the same "very good" rating was not stricken.

In sum, having considered the parties arguments with respect to the prosecution's voir dire notes, the Court finds that the defense has not carried its burden to show purposeful racial discrimination on the part of the Government.

## III.    Motion for a New Trial

### A.  Background

As noted earlier, at trial the Government alleged that Baskerville conspired with his drug trafficking associates as well has his then-defense counsel, Paul Bergrin, to murder Kemo

16

McCray for cooperating against Baskerville and to prevent McCray from testifying.  After Baskerville was convicted and while his case was pending on appeal, the Government returned an indictment against Bergrin charging him with, among other things, the murder of McCray.

In connection with Bergrin's detention hearing, the Government presented a certification of a law enforcement agent that stated that Bergrin "assisted clients in indentifying, locating and murdering witnesses against them in criminal proceedings." Def. Ex. A at ¶ 4(c).  It is also claimed that Bergrin and his associates "often used their positions as lawyers to facilitate … witness tampering activities," which included the use of "discovery given to them by prosecutors to determine the identity of witnesses they later pay off or intimidate." *Id.*  As to the murder of McCray, the certification alleges as follows:

> Baskerville discerned the identity of the informant based upon the factual allegations contained in the complaint.  BERGRIN was the defense counsel representing William Baskerville on these federal narcotics distribution charges.  In his capacity as legal counsel for William Baskerville, BERGRIN met with William Baskerville in jail.  During a jail visit, William Baskerville told BERGRIN the name of the informant …
>
> Thereafter, in a telephone conversation and a face to face meeting, Bergrin passed the identity of the informant on to William Baskerville's drug associates and told them that if they didn't kill "Kemo," William Baskerville would spend the rest of his life in jail.  After BERGRIN discussed how Baskerville's drug associates were going to pay BERGRIN's legal fee for his representation of William Baskerville, BERGRIN said that if there was no "Kemo" to testify against William Baskerville there would be no case against William Baskerville.  BERGRIN said that if "Kemo" were dead, that William Baskerville would definitely get out of jail.  When BERGRIN left the meeting, he said "remember what I said, no Kemo, no case."

*Id.* at ¶ ¶ 10-11.  The certification alleges that there have also been several other instances where Bergrin "advised, counseled, solicited, and demanded his clients kill witnesses against them."

*Id.* ¶ 16.  Baskerville contends that such evidence of Bergrin's involvement in other witness

tampering activities, including murder, constitutes exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963).

Baskerville now moves for a new trial under Federal Rule of Criminal Procedure 33 on the basis of this "newly discovered evidence that the government should have but failed to disclose under [*Brady*]." Motion at 1. Specifically, he argues that "evidence that Bergrin had orchestrated the murder of witnesses against his clients is contrary to the government's argument to the jury that it was Baskerville who orchestrated the murder of Kemo McCray." Motion at 5-6.

B.  Analysis

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *See also Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *Giglio v. United States*, 405 U.S. 150 (1972). A *Brady* violation has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L.Ed.2d 286 (1999). Such evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Ultimately, "[t]he question is not whether the defendant would more likely than not have received a different

18

verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555

Here, Defendant's motion fails to meet the relevant standard.  In particular, the evidence at issue is not favorable to the defense, that is, it is neither exculpates Baskerville nor impeaches any of the Government's witnesses against him.[6]  The disputed evidence is also not material.

As an initial matter, evidence that Bergrin helped retaliate against witnesses in other cases does not show that Baskerville did not conspire with others to kill McCray.  Indeed, if such evidence were raised at trial, it would only further prove that Bergrin knowingly participated in the conspiracy to kill McCray, an allegation that the Government clearly raised at trial.  *See, e.g.*, Trial Tr. at 5726 ("Paul Bergrin … [h]e's the [drug] organization's lawyer … He furthers the interests of the conspiracy, of the drug organization. … When you say no Kemo no case and you tell that to Rakeem Baskerville and Hakim Curry, you know what[] happens.  He's a member of the conspiracy like the others.").

Additionally, the record in this case does not support Defendant's contention that the Government's position at trial was that Baskerville "orchestrated" the murder of McCray.  Rather, the Government argued at trial that Baskerville "put in motion the plan to execute him" and "pointed Anthony Young right at Kemo McCray" by telling Bergrin the identity of  the informant and asking his brother and his cousin, Rakeem Baskerville and Hakim Curry, to "handle it."  Trial Tr. at 5830.  In so arguing, however, the Government did not minimize Bergrin's role in the conspiracy.  The Government claimed that Bergrin played an "integral part" in the murder conspiracy as the person who first passed along to Baskerville's associates that McCray was the informant.  Trial Tr. 5708.  Anthony Young, the admitted killer of McCray,

---

[6] Moreover, as the Government notes, to the extent the information could have been used to argue for a lesser punishment, Baskerville has already received the most lenient sentence available on the capital counts, and was given the mandatory sentence with respect to the drug counts.  Thus, the issue in that regard is moot.

testified that it was Bergrin who delivered the advice to Baskerville's associates of "no Kemo, no case."  Trial Tr. 4360-61.

Nor could the information regarding Bergrin's actions in other cases been used to impeach any of the prosecution's witnesses.  Indeed, Baskerville points to none and, as the Government notes, evidence that Bergrin advised other clients to murder other witnesses would have actually corroborated Anthony Young's testimony regarding the advice that Bergrin gave the drug organization in this case.

Turning to materiality, the Court notes first that to the extent that Baskerville argues that the evidence at issue could be used to support an argument that "Bergrin not Baskerville orchestrated the murder of Kemo McCray," Motion at 7, it appears that the evidence would have been inadmissible propensity evidence under Rule 404(b).  *See U.S. v. Williams*, 458 F.3d 312, 318 (3d Cir. 2006) ("[T]he prohibition against the introduction of bad acts evidence to show propensity applies regardless of whether the evidence is offered against the defendant or a third party.")  "A successful Brady challenge requires the defendant to show that the suppressed evidence is either itself admissible or would have directly led to evidence that would be admissible at a new trial or sentencing."  *Maynard v. Government of Virgin Islands*, No. 09-2273,  2010 WL 3330193, *8 (3d. Cir. 2010) (citing *Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003) ("[W]e think it plain that evidence itself inadmissible could be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it."); *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir.1999) ("Inadmissible evidence may be material if the evidence would have led to admissible evidence.").  Here, there is no allegation that such evidence would have lead to admissible evidence.

Additionally, looking at the allegedly suppressed evidence in the context of the entire record, it is clear that such evidence would have no impact on the substantial evidence showing Baskerville's participation in the conspiracy.  As the Government points out, five different witnesses, Troy Bell, Eric Dock, Richard Hosten, Eddie Williams and Ramaine Yorke testified that Baskerville made incriminating statements while he was incarcerated that undermined any contention that Baskerville was merely an unwitting beneficiary of the conspiracy.  Thus, the disputed evidence is not material in the sense that its absence from the trial resulted in a verdict "[un]worthy of confidence."  *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555.

Having found no *Brady* violation occurred, the Defendant's motion for a new trial is denied.

## IV.  Conclusion

For the reasons above, the defendant's *Batson* objection remains overruled, and his motion for a new trial is denied.  An appropriate Order accompanies this Opinion.


/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: January 14, 2011